## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
TRAVIS MILLER,                    )
                                  )
                 Plaintiff,       )
                                  )
         v.                       )         1:21CV97
                                  )
KILOLO KIJAKAZI,                  )
Acting Commissioner of Social     )
Security,                         )
                                  )
                 Defendant.¹      )
```

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Travis Miller, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 13; see also Docket Entry 12 (Plaintiff's Memorandum); Docket Entry 14 (Defendant's Memorandum); Docket Entry 15 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI (Tr. 241-52), alleging a disability onset date of October 1, 2017 (<u>see</u> Tr. 241, 244, 246). Upon denial of those applications initially (Tr. 63-88, 115-25) and on reconsideration (Tr. 89-112, 127-44), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 145-46).  Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing.  (Tr. 31-62.)  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 12-25.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 4-9, 235-40), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1.   [Plaintiff] meets the insured status requirements of the [] Act through December 31, 2023.
>
> 2.   [Plaintiff] has not engaged in substantial gainful activity since October 1, 2017, the alleged onset date.
>
> . . .
>
> 3.   [Plaintiff] has the following severe impairments: Intellectual Disability, Post-Traumatic Stress Syndrome, Panic Disorder, Bell's Palsy, and Carpal Tunnel Syndrome.
>
> . . .
>
> 4.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

2

. . .

5.  . . . [Plaintiff] has the residual functional
capacity to perform a full range of work at all
exertional levels but with the following nonexertional
limitations: [he] is limited to frequent but not
continuous handling with the dominant right hand. [He]
can frequently engage in talking and is limited to
performing unskilled work consisting of routine tasks not
at a production rate pace. [He] can maintain
concentration[,] persistence and pace for two-hour
period[s] during [a] workday. [He] is limited to
occasional interaction with supervisors, co-workers, and
[the] public. [He] requires a stable work environment,
which means few and infrequent changes to the work
routine.

. . .

6.  [Plaintiff] is unable to perform any past relevant
work.

. . .

10. Considering [Plaintiff's] age, education, work
experience, and residual functional capacity, there are
jobs that exist in significant numbers in the national
economy that [he] can perform.

. . .

11. [Plaintiff] has not been under a disability, as
defined in the [] Act, from October 1, 2017, through the
date of this decision.

(Tr. 17-25 (bold font and internal parenthetical citations
omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of [the Court's] review of [such a] decision . . . is extremely

3

limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal

4

brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]   "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's

_____

[2]  The Act "comprises two disability benefits programs.  [DIB] provides benefits to disabled persons who have contributed to the program while employed.  [SSI] provides benefits to indigent disabled persons.  The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

[5] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of
(continued...)

## B.  Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ err[ed] at step 5 [of the SEP] in relying upon the testimony of a VE who could not testify to the use of a reliable method for determining the numbers of jobs existing in the national economy for particular [<u>Dictionary of Occupational Titles</u> ('<u>DOT</u>')]-coded occupations" (Docket Entry 12 at 7 (bold font and single-spacing omitted); <u>see also</u> Docket Entry 15 at 1-3); and

2) "[t]he ALJ err[ed] by finding an RFC unsupported by substantial evidence" (Docket Entry 12 at 10 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (Docket Entry 14 at 7-22.)

## 1. VE Testimony Regarding Job Numbers

Plaintiff's first issue on review argues that "[t]he ALJ err[ed] at step 5 [of the SEP] in relying upon the testimony of a VE who could not testify to the use of a reliable method for determining the numbers of jobs existing in the national economy for particular [<u>DOT</u>]-coded occupations."  (Docket Entry 12 at 7 (bold font and single-spacing omitted); <u>see also</u> Docket Entry 15 at

---

[5] (...continued)
the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

1-3.) More specifically, Plaintiff points to the VE's testimony "that she got her [job] numbers from the Occupational Employment Quarterly (OEQ)" (id. at 8 (citing Tr. 59)), and "that th[o]se numbers are not provided for each [DOT] code, but are grouped by [] Standard Occupational Classification[ ('SOC')] codes" (id. at 9 (citing Tr 59)). Plaintiff further emphasizes that "a particular SOC code involves . . . multiple [DOT] occupations," and that "each [DOT occupation] within an SOC classification does not necessarily have the same skill or exertional requirements." (Id.) Plaintiff notes that, on cross-examination, the VE "testified that she adjusted the number from the SOC code to reflect the specific [DOT] code cited . . . by exertional and skill level," and characterized her method as "an approximation" and "the best information that we have available." (Id. (citing Tr. 59).)

Plaintiff explains that he filed a post-hearing brief "object[ing] to the method the VE used to determine number of jobs available in the economy" (id. at 7 (citing Tr. 327-29)), because "the VE failed to offer any understandable method for the derivation of the job numbers for the specific [DOT]-coded occupations cited" (id. (citing Tr. 328)). In that brief, Plaintiff additionally faulted the ALJ for failing "to elicit an understandable explanation of the VE's methods . . . on re-direct." (Id. (citing Tr. 60-61).) In Plaintiff's view, the ALJ erred in overruling Plaintiff's post-hearing objections,

because the ALJ took the position "that the numbers provided by the VE [we]re reliable because [Plaintiff] 'ha[d] not provided any evidence indicating any job provided by the [VE wa]s isolated and only exist[ed] in very limited numbers in relatively few locations, which would indicate a significant number of jobs were not available.'" (Id. at 8 (quoting Tr. 24) (internal quotation marks omitted).) According to Plaintiff, "it is not [Plaintiff] who must prove that there are not a significant number of jobs existing in the economy; rather it is the Commissioner's burden at step five to prove that there are." (Id. (citing Shinaberry v. Saul, 952 F.3d 113, 119 (4th Cir. 2020)).) Plaintiff thus contends that, "because the VE could not give an understandable account for how she derived the estimated number of jobs from the data she was employing, . . . [t]he decision must be vacated, reversed, and remanded for a new hearing." (Id. at 10 (citing Cunningham v. Berryhill, No. 3:19CV54, 2020 WL 400638, at *4 (W.D.N.C. Jan. 23, 2020) (unpublished) (in turn citing Boston v. Colvin, 4:14CV206, 2016 WL 721563, at *13 (E.D.N.C. Feb. 2, 2016)))). Plaintiff's contentions fall short.

The ALJ here queried the VE whether an individual with Plaintiff's age, education, and past work experience, as well as limited to Plaintiff's RFC, could perform any jobs existing in significant numbers in the national economy (see Tr. 55-56) and, in response, the VE opined that such an individual could not perform

10

any of Plaintiff's past relevant work, but would remain capable of performing the jobs of "warehouse worker, [<u>DOT</u>] number 922.687-058[, ] a medium job with a[ Specific Vocational Preparation ('SVP')] of 2 with an estimated [] <u>100,000</u> jobs in the [INAUDIBLE,] . . . floor worker, [<u>DOT</u>] number 381.687-034[, ] a medium [job] with an SVP of 2 and there's an estimated [] <u>1,362,000</u> jobs in the U.S.[, a]nd . . . laundry folder, [<u>DOT</u>] number 369.687-018[, ] a medium job with an SVP of 2 and there's an estimated [] <u>445,000</u> jobs in the U.S." (Tr. 57 (emphasis added)).

On cross-examination, Plaintiff's counsel and the VE had the following exchange:

> [ATTY] . . . [D]oes the [<u>DOT</u>] help provide job numbers for you?
>
> [VE] Does the – no.
>
> [ATTY] Okay, where do you get your numbers?
>
> [VE] From the [OEQ].
>
> . . .
>
> [ATTY] Are you using anything else?
>
> [VE] No.
>
> [ATTY] Okay. The OEQ, the publisher of that, is a private company and not the [g]overnment [a]gency, correct?
>
> [VE] Correct.
>
> [ATTY] And OEQ, they arrive at their numbers by providing averages that the – from the sources that [sic] the [U.S.] Department of Labor and the Census Bureau, is that correct?

11

[VE] Yes.

[ATTY] And the numbers that they provide, the Census Bureau and the Department of Labor, are those provided by [DOT] code?

[VE] No, those are provided by SOC codes.

[ATTY] Okay and SOC codes, those are broader definitions than [DOT] codes and they contain multiple [DOT] codes, correct?

[VE] Yes.

[ATTY] And each [DOT] code within the SOC code does not necessarily have the same skill or exertional requirements, correct?

[VE] Yeah, so the – what I do, I cross-reference the [DOT] code with the census code and SOC code to find the most appropriate SOC code for the [DOT] title.

[ATTY] Okay. And you adjusted the number from the SOC code to reflect the specific [DOT] code that you cited, correct?

[VE] Yes.

[ATTY] And how did you do that; how'd you separate those numbers?

[VE] They're, they're by exertional and skill level.

[ATTY] Okay, but how did you separate the SOC, where they give a very broad number, down to the specific [DOT] level? How did you get a specific number for the code that you'd cited or are those number[s] not for those specific code, are they for the SOC?

[VE] No, so I cross-referenced the [DOT] codes with the census codes and the SOC codes to find the most appropriate SOC for the [DOT] title.

[ATTY] That, okay, that – I, I think I understand your, your cross-referencing, but what I'm asking is how – so, the SOC codes, let's just say it contains ten jobs. How, how do you get down to the specific [DOT] numbers? What do you mean by cross-reference?

12

[VE] I, I think I answered that question with the cross-referencing.

[ATTY] Okay, I guess I'm, I'm struggling to understand exactly what that means. I mean I understand that there are multiple exertion levels, but what I'm saying is, an SOC group says that there's a million and a half jobs and it contains ten different jobs, how do you get down to the [<u>DOT</u>] number of those when you're not provided with that by either of the –

[VE] They are provided –

[ATTY] OEQ or the –

[VE] <u>They are broken down by the skill and exertion level. And that is an approximation, so that's what I used. And that is the most, the best information that we have available.</u>

[ATTY] Okay, <u>so it's not necessarily by [DOT] as much as it is just by exertional and skill level</u>.

[VE] <u>Yes</u>.

[ATTY] Okay and the numbers that you provided, those are also for full-time positions only, correct?

[VE] They are 18 percent[] part-time jobs.

[ATTY] Okay. So it, it includes some jobs that may not meet this, that full-time requirement?

[VE] Correct.

(Tr. 58-61 (emphasis added).)

Following the hearing, Plaintiff's counsel submitted objections to the VE's testimony (<u>see</u> Tr. 327-29), arguing that "[t]he VE's testimony was flawed and unreliable because the VE did not demonstrate a reliable method for adjusting the numbers of jobs provided by the [OEQ] down to the specific [<u>DOT</u>] codes she

13

provided" (Tr. 327). In particular, Plaintiff lodged the following complaint against the VE's job numbers:

> When asked if the VE had adjusted the provided numbers to only give the numbers for the [DOT] coded occupations and not the entire SOC code the VE stated she had done so. When questioned regarding the method for making such a calculation (which the [Bureau of Labor Statistics ('BLS')], Census Bureau, nor OEQ provide] the VE stated she cross-referenced the exertional levels and skill levels given by the [DOT] coded occupations. When asked exactly what the process is, the VE simply restated the same information, cross-referencing exertional levels and skill levels. Counsel asked one more question, confirming that the only method and source used was the cross-referencing the OEQ and [DOT], to which the VE responded in the affirmative.

(Tr. 328.)

The ALJ subsequently adopted the VE's testimony as to Plaintiff's ability to perform the three jobs in question, as well as the jobs' incidence in the national economy (see Tr. 23-24), and then resolved Plaintiff's objections to the VE's jobs numbers as follows:

> The [VE] testified that she relied on job numbers provided by [OEQ]. As noted by [Plaintiff]'s representative, the OEQ is published by U.S. Publishing, a private company. The job data is derived from the U.S. Department of Labor ([BLS]) and the U.S. Department of Commerce (Census Bureau). The OEQ provides job data by [SOC] codes []. The [VE] testified that she cross-references[] the job codes from the [DOT], the US Census Bureau and the SOC to determine the appropriate SOC code to use for the representative jobs that she identifies. The OEQ also provides job number estimates for a particular SOC based on exertional and skill level.

14

The issue pertaining to jobs available is whether a significant number of jobs exist in the national economy. While an estimate on the number of jobs available is useful for evaluating this issue, a significant number of jobs does not pertain to any particular numerical standard. [Plaintiff]'s representative has not provided any evidence indicating any job provided by the [VE] is "isolated and only exists in very limited numbers in relatively few locations," which would indicate a significant number of jobs were not available. 20 CFR 404.1566, 416.966. The [VE] has provided job numbers, which do indicate a large number of jobs are available. Additionally, there is no evidence offered that another [VE] would offer more persuasive testimony. An exact number of jobs need not be provided; rather, the burden at Step 5 of the [SEP] is to show that a significant number of jobs exist within the confines of the hypothetical. The [VE], as an impartial [VE], is qualified for the purposes of the testimony at the hearing and is qualified to provide an estimate of jobs by referencing data that has long been recognized by the [SSA] as adequate. The [ALJ] finds no reason to question the testimony of the impartial [VE] - despite the objections raised – and finds that a sufficient number of jobs exist in the cited positions. Any objection to these job numbers on the ground that the [VE]'s methodology for determining numbers of jobs is not reliable on this basis is overruled.

(Tr. 24-25 (emphasis added).)

Contrary to Plaintiff's allegations (see Docket Entry 12 at 8), the ALJ's above-quoted discussion of Plaintiff's objections adequately addressed the matter. The ALJ specifically discussed Plaintiff's argument that the VE did not sufficiently explain her methodology for adjusting job numbers by noting that (1) "[t]he OEQ [] provides job number estimates for a particular SOC based on exertional and skill level" (Tr. 24) (2) "a significant number of jobs does not pertain to any particular numerical standard" (id.) and "[a]n exact number of jobs need not be provided" (Tr. 25), and

15

(3) "[t]he [VE ] provided job numbers, which do indicate a large number of jobs are available" (id.). Furthermore, the ALJ did not inappropriately place the step five burden on Plaintiff by observing that Plaintiff's counsel offered neither "any evidence indicating any job provided by the [VE wa]s 'isolated and only exist[ed] in very limited numbers in relatively few locations,' which would indicate a significant number of jobs were not available" (Tr. 24 (quoting 20 C.F.R. §§ 404.1566, 416.966)), nor "evidence [] that another [VE] would offer more persuasive testimony" (Tr. 25). The ALJ clearly found that the VE's testimony satisfied the Commissioner's step-five burden to show the existence of a significant number of jobs available in the national economy (see Tr. 23-25) and, thus, to prevail on post-hearing objections to that determination, Plaintiff must come forward with a showing sufficient to counter that finding. The ALJ merely found that Plaintiff did not do so. (See Tr. 24-25.)

Moreover, Plaintiff's contention that "the VE failed to offer any understandable method for the derivation of the job numbers for the specific [DOT]-coded occupations cited" (Docket Entry 12 at 7; see also Docket Entry 15 at 1-3) misses the mark. Here, the VE specifically testified that she adjusted the number of jobs she cited to account for DOT occupations within the applicable SOC

16

codes at higher skill levels than Plaintiff's unskilled RFC.[6]
Plaintiff simply has not demonstrated how that methodology
qualifies as unreliable. (See Docket Entries 12, 15.) As
addressed by a neighboring district court:

> [C]ourts have consistently upheld an ALJ's reliance on a
> VE's proposed job numbers derived from OEQ data when the
> VE further adjusts the number of jobs in the broader OEQ
> category to a number that reflects the number of jobs for
> the cited [DOT] occupation and provides a reasonable
> basis for having done so.
>
> . . .
>
> These cases illustrate that, despite the lack of
> specificity of the OEQ job incidence data, it is possible
> for a VE to make a reasonable adjustment to reflect
> [DOT]-specific job numbers by calling on other available
> sources as well as professional experience.

Boston, 2016 WL 721563, at *11-12 (emphasis added); see also
Taylor v. Colvin, No. CIV.A. 140573, 2015 WL 3603957, at *14 (E.D.
La. June 5, 2015) (unpublished) (upholding ALJ's decision where
"the VE quite clearly testified that the job numbers that she
provided for [OEQ] Census Code 540 were only for light, unskilled
positions, as required by the ALJ's hypothetical question, and not
the other 13 positions that fell under the [DOT] job title which
included skilled and semiskilled occupations"); Small v. Colvin,
No. 1:12CV236, 2013 WL 1912892, at *8 (D. Me. Mar. 30, 2013)
(unpublished) (approving VE's reliance on SOC code job numbers
where he provided DOT-specific job numbers based on knowledge that

---

[6] Given that the ALJ found Plaintiff capable of work at all exertional levels
(see Tr. 20), the VE would not have needed to eliminate any job numbers for jobs
at higher exertional levels than Plaintiff's RFC.

17

one of DOT jobs constituted "predominant job" of three jobs within broader SOC code and personal observation of newspaper job openings for particular DOT job), recommendation adopted, 2013 WL 1912862 (D. Me. May 8, 2013) (unpublished); Nichols v. Astrue, No. CIV.A. 10-11641, 2012 WL 474145, at *12 (D. Mass. Feb. 13, 2012) (unpublished) (finding no error where VE adjusted job numbers from SOC code to reflect only DOT occupations that would accommodate the claimant's standing/walking limitation); see also Liskowitz v. Astrue, 559 F.3d 736, 745 (7th Cir. 2009) (finding no error in ALJ's reliance on VE's testimony and refusing to "impose impossible burdens on the VE" where "VE testified that she had 'no way of knowing' how many of the jobs that she had identified were part-time jobs" because that "information was not contained in the data sources on which she based her testimony," and the plaintiff's "counsel conceded . . . that _no_ government data source contain[ed] th[at] information").

Moreover, even if the VE failed to sufficiently explain the methodology she utilized to adjust the job numbers from SOC codes to DOT codes, the ALJ's overruling of Plaintiff's objection on that point constitutes harmless error under the circumstances of this case. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might

18

lead to a different result"). Even if <u>some</u> of the <u>DOT</u> occupations within the applicable SOC codes for warehouse worker, floor worker, and laundry folder entailed higher skill levels than Plaintiff's unskilled RFC and/or part-time jobs, the VE testified that over <u>1.3 million</u> floor worker jobs existed in the national economy. "[F]ar smaller figures would still suffice to satisfy the Commissioner's [step five] burden." <u>Guiton v. Colvin</u>, 546 F. App'x 137, 142 (4th Cir. 2013) (citing <u>Hicks v. Califano</u>, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (finding 110 jobs in state significant number of jobs)). Accordingly, the Court should find "that the jobs numbers the VE provided, although perhaps somewhat imprecise, were sufficiently reliable to support the ALJ's conclusion." <u>Guiton</u>, 546 F. App'x at 142-43.

In light of the foregoing analysis, Plaintiff's first assignment of error falls short.

## 2. Dr. Joseph Appollo's Opinions[7]

In Plaintiff's second and final issue on review, he maintains that "[t]he ALJ err[ed] by finding an RFC unsupported by substantial evidence." (Docket Entry 12 at 10 (bold font and single-spacing omitted).) In particular, Plaintiff asserts that "[t]he ALJ f[ou]nd[] the opinions of [Dr.] Appollo[ ] 'somewhat

---

[7] Although Plaintiff characterized his second issue on review in its heading as arguing that the ALJ "f[ound] an RFC unsupported by substantial evidence" (Docket Entry 12 at 10 (bolt font omitted)), the crux of Plaintiff's second assignment of error relates to his contention that the ALJ erred in evaluating the opinions of consultative psychological examiner Dr. Joseph Appollo (<u>see id.</u> at 11-12).

persuasive,' due to objective evidence in the record which '[wa]s not fully consistent' with the opinion, . . . [b]ut the ALJ d[id] not identify objective evidence that [wa]s inconsistent with Dr. Appollo's opinion." (Id. at 11 (quoting Tr. 22).) Plaintiff additionally challenges the ALJ's finding that Dr. Appollo's opinions "'overly rely on [Plaintiff]'s subjective statements'" (id. (quoting Tr. 22)), noting that "Dr. Appollo administered a mental status exam, which is an objective assessment" (id. (citing Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017))), that resulted in him finding that Plaintiff had "borderline ability to understand, retain, and follow instructions, below average ability to sustain attention to perform simple, repetitive tasks," and "moderate difficulty in the ability to tolerate stress and pressure associated with day-to-day work activity" (id. at 12 (citing Tr. 367)). According to Plaintiff, "the ALJ should have adopted Dr. Appollo's limitations on [Plaintiff]'s ability to tolerate stress and pressure" (id. (referencing Tr. 367)) and "that[,] if a hypothetical individual is not able to maintain two-hour work periods, the VE responded that no competitive work would be possible" (id. (citing Tr. 57)). Plaintiff further points out that, "if the ALJ had added a limitation that an individual requires close supervision, meaning that a supervisor is required to check on the person at least twice a day to verify they [sic] are doing the job properly and at an acceptable pace, the VE

responded that no competitive work would be possible." (Id. (citing Tr. 57).) For the reasons explained below, Plaintiff's arguments fail as a matter of law.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 241-52)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs are no longer required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. See 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources"). Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b) (emphasis added). In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R.

21

§§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ must address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. §§ 404.1520c(c)(3)-(5), 416.920c(c)(3)-(5) — only when the ALJ finds two or more opinions or findings about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

On July 17, 2019, Dr. Appollo conducted a consultative psychological examination of Plaintiff (see Tr. 363-68), at which Dr. Appollo documented Plaintiff's subjective statements that he "witnessed a good deal of violence in his household while growing up," that he "was a victim of a car hijacking and robbery in his early 20s" that involved the firing of a gun, that he "ha[d] ongoing problems with sleep" and "some periods of flashbacks," that he "d[id] not like to be around people" and "[wa]s easily startled and jumpy," and "suffer[ed] panic attacks" that "occur one time a week or sometimes more frequently." (Tr. 364.) Dr. Appollo further noted that Plaintiff reported "feel[ing] sad and depressed" and that "people [we]re against him," as well as that he "had difficulty getting along with coworkers and management" at his last job. (Id.)

On mental status examination, Dr. Appollo recorded that Plaintiff "appeared very neat and clean in his appearance," that he "was pleasant, friendly and open," that "[r]apport was easily established," and that "[e]ye contact was established and maintained." (Tr. 365.) In addition, Dr. Appollo documented no abnormalities in Plaintiff's speech (see id.) or thoughts (see Tr. 366), and reported that, although Plaintiff's "emotional state was characterized by feelings of depression," he "showed a normal amount of range of affect and emotional responsiveness," as well as that his "emotional expression was appropriate to the thought content and situation." (Id.) Dr. Appollo observed that Plaintiff encountered some difficulties with tasks testing his attention and concentration (see id.), as well as performing subtraction and division calculations (see Tr. 367), and rated his "intellectual functioning . . . in the borderline range" (id.), but noted that his "recent memory skills appeared intact" (Tr. 366), and that he "had adequate insight into his problems" (Tr. 367).

As a result of Plaintiff's subjective symptom reporting and the mental status examination findings, Dr. Appollo diagnosed Plaintiff with "Post Traumatic Stress Disorder, rule out," "[p]anic disorder, rule out," and "[i]ntellectual disability, mild, rule out" (Tr. 376), and provided the following opinions:

> [Plaintiff] does have the ability to conform to social standards, rules and regulations. He does have the ability to cooperate with authority figures and interact with peers.

23

. . .

[Plaintiff] has borderline ability to understand, retain
and follow instructions. [He] has below average ability
to sustain attention to perform simple repetitive tasks.
[He] has a <u>history</u> of not getting along with his fellow
workers and supervisors. [He] also <u>reports</u> he is easily
angered and tends to argue.

<u>[He] continues to have some symptoms of PTSD and anxiety.
He continues to suffer from panic attacks</u>. [He] would
have moderate difficulty in the ability to tolerate
stress and pressure associated with day-to-day work
activity.

. . .

PROGNOSIS: Guarded

. . . [He] has minimal skills to manage his funds. He
would better perform this task by some assistance.

(Tr. 366-68 (emphasis added).)

The ALJ analyzed the opinions of Dr. Appollo as follows:

The medical opinions of consultative examiner [Dr.]
Appollo[ ] are somewhat persuasive. Dr. Appollo
personally examined [Plaintiff], and opined that [he]
would have difficulty with the ability to understand,
remember, or apply information and performing simple
repetitive tasks, and tolerating stress. However, [Dr.
Apollo's] medical opinions overly rely on [Plaintiff]'s
subjective statements, and are not fully consistent with
the objective evidence in the record. While the record
indicates [Plaintiff] has some functional limitations
consistent with [Dr. Appollo's] medical opinions, it is
not fully consistent. As a result, the [ALJ] finds these
medical opinions to be only somewhat persuasive.

(Tr. 22 (emphasis added) (internal parenthetical citation
omitted).) As discussed above, Plaintiff challenges the ALJ's
evaluation of Dr. Appollo's opinions on two grounds, neither of
which establish grounds for remand.

24

Plaintiff first faults the ALJ for finding Dr. Appollo's opinions "not fully consistent" with the objective evidence of record, but failing to identify what "objective evidence" conflicts with Dr. Appollo's opinions.  (Docket Entry 12 at 11 (quoting Tr. 22).)  Although the ALJ did not specifically identify the objective evidence that conflicted with Dr. Appollo's opinions (see Tr. 21-22), the Court should discern no error from that omission.  The record contains only two medical records during the relevant period, beyond Dr. Appollo's assessment – 1) an emergency room visit on October 12, 2018, at which Plaintiff complained of left-sided facial numbness and weakness, headache, and lower back pain (see Tr. 339-43), and 2) a consultative medical evaluation conducted by Dr. Stephen Burgess on June 24, 2019 (see Tr. 372-76).  At the emergency room visit, the examining physician noted that Plaintiff had normal mood, affect, judgment, and thoughts, and did not appear agitated (see Tr. 341), and Dr. Burgess observed that Plaintiff's "[i]ntellectual functioning appear[ed] normal," that his "[r]ecent and remote memory for medical events [wa]s good," and that he "was cooperative with the exam" (Tr. 373), as well as that Plaintiff's cognition, mood, and affect "appear[ed] normal" with "no evidence of suicidal or homicidal ideation[, ] hallucinations, delusions, or paranoia" (Tr. 375).  Thus, the only other objective evidence of Plaintiff's mental functioning in the record did not harmonize with Dr. Appollo's opinions.  Under such circumstances,

25

the ALJ did not err by discounting Dr. Appollo's opinions, in part, because they did not fully cohere with the objective evidence of record.  (See Tr. 22.)

Plaintiff also objects to the ALJ's finding that Dr. Appollo's opinions "'overly rely on [Plaintiff]'s subjective statements'" (Docket Entry 12 at 11 (quoting Tr. 22)), and points out that "Dr. Appollo administered a mental status exam, which is an objective assessment" (id. (citing Buck, 869 F.3d at 1049)).  That argument fails, however, because the fact that Dr. Appollo conducted an objective assessment of Plaintiff's mental functioning does not preclude a finding of over-reliance on Plaintiff's subjective statements in forming opinions.  As noted above, Dr. Appollo found Plaintiff "pleasant, friendly and open," with "[r]apport [] easily established," and "[e]ye contact [] established and maintained" (Tr. 365) and thus Dr. Appollo based his statement that Plaintiff "ha[d] a history of not getting along with his fellow workers and supervisors" and "report[ed] he [wa]s easily angered and tend[ed] to argue" (Tr. 367) on Plaintiff's subjective statements rather than any objective findings.  Similarly, Dr. Appollo did not make any observations on mental status examination of anxiety, jumpiness, panic symptoms, or PTSD symptoms (see Tr. 365-67) and thus his statement that Plaintiff "continue[d] to have some symptoms of PTSD and anxiety . . . [and] suffer from panic attacks" that would result in "moderate difficulty in the ability to

26

tolerate stress and pressure associated with day-to-day work activity" (Tr. 367) again relied on Plaintiff's subjective reports rather than any objective findings. As the ALJ did not err in discounting Dr. Appollo's opinions based, in part, on his over-reliance on Plaintiff's subjective symptom reporting, the ALJ labored under no obligation to "adopt[] Dr. Appollo's limitations on [Plaintiff]'s ability to tolerate stress and pressure" (Docket Entry 12 at 12 (referencing Tr. 367)).[8]

In sum, Plaintiff's second and last assignment of error lacks merit.

### III. CONCLUSION

Plaintiff has not established an error warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

April 4, 2022

---

[8] Plaintiff's argument that the ALJ should have included in the dispositive hypothetical question to the VE "a limitation that [the hypothetical] individual require[d] close supervision, meaning that a supervisor [wa]s required to check on the person at least twice a day to verify they [sic] are doing the job properly and at an acceptable pace" (Docket Entry 12 at 12) fares no better. Dr. Appollo did not even offer that opinion (see Tr. 363-68) and thus Plaintiff has simply not shown that any record evidence warranted the inclusion of such a limitation.

27